**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| SERVICE EMPLOYEES INTER-<br>NATIONAL UNION, LOCAL 3, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  1:05-cv-1761-JDT-TAB |
| | ) | |
| CITY OF INDIANAPOLIS, INDIANA, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT**
**OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

**Introduction**

Defendant City of Indianapolis, Indiana (hereinafter, "the City") has a Noise

Ordinance which prohibits within the city any "loud, unnecessary or unusual" noise

which "annoys" or "disturbs" others within the city.  (Section 391-302 of the Revised

Code of the Consolidated City and County of Indianapolis/Marion, Indiana [hereinafter,

"Noise Ordinance"].)  Plaintiff Service Employees International Union, Local 3,

(hereinafter, "Local 3") and/or its supporters have been cited, and risk being cited again

in the future, for violation of the Noise Ordinance while engaging in peaceful labor

protests on the public sidewalks of the city.  On its face, the City's Noise Ordinance is an

unconstitutional, content-based restriction on free speech, is not a reasonable time, place

and manner restriction, and is unconstitutionally vague and overbroad, all in violation of

the First and Fourteenth Amendments to the United States Constitution.   The Noise

Ordinance is causing the Plaintiff irreparable harm; therefore, a preliminary injunction

1

should now issue.

## Preliminary injunction standard

The standard for granting a preliminary injunction in the Seventh Circuit is clear:

> The plaintiff bears the burden of establishing five
> requirements...(1) that it has no adequate remedy at law; (2)
> that it will suffer irreparable harm if the preliminary
> injunction is not issued; (3) that the irreparable harm it will
> suffer if the preliminary injunction is not granted outweighs
> the irreparable harm the defendant will suffer if the
> injunction is granted; (4) that it has a reasonable likelihood
> of prevailing on the merits; and (5) that the injunction will
> not harm the public interest.

*Baja Contractor, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987), *cert. den.*

485 U.S. 993 (1988).  The heart of this test, however, is "a comparison of the likelihood,

and the gravity of two types of error:  erroneously granting a preliminary injunction, and

erroneously denying it."  *General Leaseways, Inc. v. National Truck Leasing Association*,

774 F.2d 588, 590 (7th Cir. 1984).  Following this standard, it is clear that a preliminary

injunction must be granted in this case.

## Facts

The following facts are established through the Parties' Stipulation to Facts and/or

the Amended Affidavit of Rebecca Maran:

Within its Revised Code, the City has enacted the Noise Ordinance, Section 391-

302.  This ordinance states, in relevant part:

> (a)    Except as otherwise provided in this section, it shall be unlawful for any
> person to make, continue or cause to be made or continued any loud,
> unnecessary or unusual noise, or any noise which either annoys, disturbs,
> injures or endangers the comfort, repose, health and peace or safety of
> others within the city.  Accordingly, the following acts, among others, are
> declared to be loud, disturbing and unnecessary noises and in violation of
> this section, but such enumeration shall not be deemed to be exclusive:
>
> …

(2)   *Radios and phonographs*.[1]  Playing, using or operating, or permitting to be played used or operated, any … musical instrument … in such a manner as to disturb the peace, quiet and comfort of the neighboring inhabitants, or at any time with louder volume than is necessary for convenient hearing for the person or persons who are in the room, vehicle or chamber in which such machine or device is operated, and who are voluntary listeners thereto…

(3)   *Loudspeakers, amplifiers for advertising*.  Playing, using or operating, … any … musical instrument … at any place upon the public streets … for the purpose of … attracting the attention of the public to any activity or building or structure, which is so used as to disturb and annoy other persons in their businesses, homes or elsewhere in their right of personal privacy and quiet.

(4)   *Yelling, or shouting*.  Yelling, shouting, hooting, whistling or singing on the public streets, particularly between the hours of 10:00 p.m. and 7:00 a.m., or at any time or place so as to annoy or disturb the quiet, comfort or repose of persons in any office, or in any dwelling, hotel or other type of residence, or of any person in the vicinity.

…

(13)  *Drums*.  The use of any drum, horn or other instrument or device for the purpose of attracting attention by creation of noise to any performance, exhibition, show or sale; except in a parade or place for which a permit has been granted.

…

City Revised Code, §391-302(a)(3)(4), attached hereto.[2]

The City's stated purpose for its Noise Ordinance is "to secure and promote the public health, comfort, convenience, safety, welfare and prosperity, and the peace and quiet of the inhabitants and visitors in this city."  City Revised Code, §391-301(3).  A first violation of §391-302(a) in a calendar year is "subject to admission of violation and payment of the designated civil penalty…," and a second and subsequent violations of

---

[1]  To the extent this provision applies to the public streets and/or sidewalks of downtown Indianapolis, Plaintiff challenges this portion of the ordinance as well.  However, given the language of this subsection and the following subsection (3), it is not clear that subsection (2) does apply to noise outside of a "room, vehicle or chamber."

[2]  Plaintiff challenges only these cited portions of the Noise Ordinance.

§391-302(a) in a calendar year is punishable by a penalty of not more than two thousand five hundred dollars ($2,500). City Revised Code, §391-302(b); §103-3(a). The City is also authorized to "enjoin or abate" any violation of the Noise Ordinance by "appropriate action." City Revised Code, §103.3(b).

The Service Employees International Union is an international labor union whose members are service workers. Local 3 is a chapter of this union, with an office located in Indianapolis, Indiana. The Indianapolis office of Local 3 is actively organizing local commercial building janitors. Since approximately June 15, 2005 and as part of its organizing efforts, Local 3 has instituted the "Justice for Janitors" campaign. As part of that campaign, Local 3 and its supporters engaged in an unfair labor practice strike against Group Service France (GSF) on behalf of the janitors. The Local 3 strike consisted of picketing on City sidewalks at various locations and at various times of day in downtown Indianapolis. Local 3 and its supporters use various noise-makers while picketing in order to draw the attention of those around them to their strike.

Since they began their strike, Local 3 and its supporters picketed on behalf of the janitors at downtown Indianapolis locations that include the following: the outer sidewalks around Monument Circle, sidewalks on the corner of Washington and Illinois streets, sidewalks on the corner of Capitol and Washington streets, sidewalks on the corner of Capitol and Georgia streets, and sidewalks on the corner of Ohio and Delaware streets. Local 3 and its supporters picketed at various times of day in between the hours of 8:00 a.m. and 9:00 p.m. While picketing, Local 3 and its supporters walked up and down the public sidewalks, chanting various words of protest regarding GSF's employment practices and often holding signs which also protest those practices. They

also sometimes ring bells and/or beat on drums or buckets to call attention to themselves and their protest activities.

During over a dozen different picketing occasions, Local 3 and its supporters have been approached by Indianapolis Police Department (IPD) officers regarding the noise caused by the picketing activities.  On some, but not all, of these occasions, the IPD officers informed Local 3 and its supporters that IPD had received complaints regarding the noise being made by the picketers.  On some occasions, the IPD officers stated that Local 3 could not make any noise at all; on other occasions, IPD officers stated that the picketers could chant but could not use other noise-makers such as musical instruments. On some occasions, IPD officers only gave the picketers verbal warnings regarding the noise level; on other occasions, IPD officers gave the picketers a verbal warning and then a citation for violation of the Noise Ordinance; on yet other occasions, IPD officers gave some of the picketers citations for violation of the Noise Ordinance with no previous verbal warning.  On occasions where IPD officers issued citations for violations of the Noise Ordinance, the officers cited individuals at random rather than citing all picketers. For example, on or about late July 2005, Local 3 and its supporters were picketing on the sidewalks in front of a garage located on Illinois street, in between Ohio and Market streets, and one of the picketers was ringing a bell; an IPD officer cited three individual picketers who were not ringing a bell for violation of the Noise Ordinance, while the bell-ringer was not cited at all.  On various other occasions, Local 3 and its supporters have picketed on downtown Indianapolis sidewalks using bass drums and other instruments without any contact from city police at all.

On or October 13, 2005 at about 6:30 p.m., Local 3 and its supporters were

picketing on the outer sidewalks surrounding Monument Circle, using drums and chanting, when they were approached by an IPD officer and informed that they were in violation of the Noise Ordinance.  Although no one was cited, the IPD officer did inform Local 3 and its supporters that they were not permitted to ever make any noises during their picketing except chanting, and that even chanting too loudly could result in a Noise Ordinance violation.

Rebecca Maran is a lead organizer employed with Local 3 who has organized the Justice for Janitors campaign, including the janitors' strike activities against GSF.  On or about October 17, 2005, Ms. Maran initiated a meeting with Captain John Bent of the IPD regarding Local 3's strike activities on the public streets downtown.  At this meeting, Captain Bent stated that Local 3 and its supporters could continue to picket on the sidewalks of downtown Indianapolis while chanting and using noise makers so long as the IPD received no complaints regarding their noise; however, he stated that the picketers could not ever use buckets or drums when on or around Monument Circle.

While subsequently picketing on the sidewalks on the corner of Washington and Illinois streets at approximately 6:30 pm on October 26, 2005, a Local 3 supporter was issued a citation by an IPD officer for ringing a bell, although the officer confirmed that the officer had received no complaint regarding the picketers' noise.  On November 1, 2005, Captain Bent telephoned Rebecca Maran to inform her, without further explanation, that the citation issued to the bell ringer on October 26, 2005 was being voided.

Local 3 and its supporters recently entered into an agreement with GSF regarding GSF's alleged unfair labor practices; therefore, Local 3 has ceased protest activities

regarding GSF.  However, Local 3 has plans to organize other companies in downtown Indianapolis on or after January 1, 2006 as part of the Justice for Janitors campaign. Typically, Local 3's efforts to organize company workers are met with resistance by the companies themselves, thus requiring Local 3 and its supporters to engage in picketing and/or protesting activities as part of its organizing effort.  Local 3 and its supporters believe it is essential to use noise-makers and to chant loudly while picketing and/or protesting in order for them to draw the attention of those around them to their protest and/or picket, especially in the downtown Indianapolis area.  There would be little, if any, reason for a resistant employer to agree to organization of its workers if Local 3 and its supporters did not have the option of engaging in effective picketing and/or protesting of the resistant employer.  Therefore, Local 3 wishes to be able to engage in protest activities in the future in downtown Indianapolis.

There are currently no citations outstanding that have been issued to any Local 3 supporters as a result of picketing activities on behalf of the janitors.  However, Local 3 and its supporters are uncertain what is required of them by the City's Noise Ordinance when they are engaged in picketing activities downtown in the future.

**Argument**

**I.      Plaintiff will prevail on the merits because, on its face, the City's Noise Ordinance clearly violates both the First and Fourteenth Amendments to the United States Constitution.**

      A.      <u>The Noise Ordinance is not a reasonable time, place, and manner restriction in that it is content-based and not narrowly tailored to serve a compelling government interest</u>.

Public streets and sidewalks are the archetypes of traditional public fora.  *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)("'[T]ime out of mind' public streets and sidewalks

have been used for public assembly and debate, the hallmarks of a traditional public forum."). *See also*, *Ovadal v. City of Madison*, 416 F.3d 531, 536 (7th Cir. 2005)("All public sidewalks 'are held in the public trust and are properly considered traditional public fora.'"), quoting *Frisby*, *supra*. The test for government regulations of speech in traditional public fora was recently summarized by the Seventh Circuit:

> When speech takes place in a traditional public forum, it receives heightened constitutional protection. The government may restrict the time, place, and manner of the speech, but only if the restrictions are content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative means of communication. If a restriction is based on the content of the speech, it is unconstitutional unless the state can prove that the regulation is necessary to serve a compelling state interest and that the regulation is narrowly drawn to achieve that end.

*Ovadal* at 536, citations omitted (citing *Frisby*, *supra*).

The City's Noise Ordinance in this case is based on the content of speech to the extent it prohibits noise that "annoys" or "disturbs" other persons, yet it is not necessary to serve a compelling government interest, nor is it narrowly tailored toward such an end. Moreover, even if the Noise Ordinance was content-neutral, it is still unconstitutional because of its lack of narrow tailoring.

1. *To the extent the Noise Ordinance prohibits speech that "annoys" or "disturbs" others, it is a content-based restriction that is not necessary to serve a compelling government interest.*

The City's Noise Ordinance is a content-based restriction on speech. By prohibiting noise that "annoys" or "disturbs" others, it "selectively proscribes a certain category of speech; that which the listener views as 'annoying.'" *Fratiello v. Mancuso*, 653 F.Supp. 775, 791 (D.RI 1987). Yet, it is clear that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). *See also*, *Saia v. State of New York*, 334 U.S. 558, 562

(1948)(finding unconstitutional an ordinance that prohibited noise that was "annoying" to others, and noting that "[a]nnoyance at ideas can be cloaked in annoyance at sound."); *Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971)("The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people. … [S]uch a prohibition … contains an obvious invitation to discriminatory enforcement against those whose association together is 'annoying' because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens."); *Ovadal*, *supra*, at 537 (restriction is content-based when it allows police "to decide on an ad hoc basis whether to allow the protest to continue depending on how drivers react to the signs on the pedestrian  overpass."); *Dupres v. City of Newport*, 978 F.Supp. 429, 435 (D.RI 1997)(noise ordinance prohibiting noise that "annoys" or "disturbs" others was an unconstitutional content-based restriction on speech); *Fratiello*, *supra*, at  791 (noise ordinance prohibiting noise "annoying" to others was "a subjective content-based restriction" that "invites suppression of unpopular ideas.")[3]

Because the City's Noise ordinance prohibits speech based upon the listeners' reaction to the speech, it is content-based.  In order for a content-based statute to pass constitutional muster, it must be necessary to achieve a compelling government interest and it must be narrowly drawn to achieve that end.  *Boos v. Barry,* 485 U.S. 312, 321 (1988), quoting *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983).  The Noise Ordinance in this case meets neither of these criteria.

---

[3] By prohibiting speech that "annoys" or "disturbs" others, the Noise Ordinance essentially creates a "heckler's veto" which, while not viewpoint based, is nevertheless content-based.  *Boos v. Barry*, 485 U.S. 312, 319 (1988)(noting that government regulation which is viewpoint neutral may nevertheless be content-based when it prohibits an entire category of speech).  In this case, the Noise Ordinance prohibits the entire category of speech that is "annoying" or "disturbing" to others.

    2.    *The content-based Noise Ordinance is not narrowly tailored to acheive a compelling government interest.* [4]

The test of narrow tailoring is "a balancing test, inquiring whether the restriction 'burdens more speech than is necessary'" to further the government's interest. *United States v. Doe*, 968 F.2d 86, 88 (D.C.Cir. 1992). It is the government's burden to prove that its restriction on speech is narrowly tailored. *Id.* at 90 ("Where constitutionally protected activity is implicated, we cannot simply defer to the Park Service's unexplained judgment" that a 60-decible limit is narrowly tailored to achieve the government's goals); *Lionhart v. Foster*, 100 F.Supp.2d 383, 387 (E.D.La. 1999)("The government bears the burden of justifying its regulation as narrowly tailored."); *Rohman v. City of Portland*, 909 F.Supp. 767, 774 (D.Or. 1995)("Because this is a First Amendment challenge, the City bears the burden of showing that the Free Speech Policy is warranted under this [narrow tailoring] standard."). Thus, the Court must first determine the government interest in the restriction, and then determine whether the restriction is narrowly tailored to that interest. *Doe*, 968 F.2d at 88.

In this case, the City's stated interest in the Noise Ordinance is "to secure and promote the public health, comfort, convenience, safety, welfare and prosperity, and the peace and quiet of the inhabitants and visitors in this city." City Revised Code, §391-301(3). Whether or not this is a compelling, or even legitimate, government interest depends a great deal upon "the essential nature of the locations involved." *Doe* at 89. The government cannot have a legitimate, generalized interest "in maintaining the same

---

[4] Even if the ordinance was considered content-neutral, it would still be unconstitutional. Although a content-neutral statute need not use the least restrictive means to meet the government's interest, it nevertheless must be narrowly tailored to that interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-799 (1989). Because the Noise Ordinance here is not narrowly tailored to meet any government interest (whether compelling or significant), it is unconstitutional whether it is content-based or content-neutral.

level of quiet in all public places."  *Id*.  Rather, the interests of citizens in privacy and tranquility are "tied to certain locations and spaces," and the "city thus must make some effort to tailor its ordinance in relation to place as well as time."  *Reeves v. McConn*, 631 F.2d 377, 384 (5th Cir. 1980).  In other words, a government only has a legitimate interest in preventing noise that is "excessive" for the particular location at issue.  *Id*.

Therefore, Plaintiffs assume that the City has a compelling interest in preventing "excessively loud" noise in downtown Indianapolis.  To determine whether the ordinance is narrowly tailored to serve that interest, the crucial question is what "manner of expression is basically incompatible with the normal activity of" downtown Indianapolis during the daytime.  *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972).  *See also*, *Doe*, 968 F.2d at 91 ("What is excessive [noise] must take into account the nature and purposes of the setting, along with its ambient characteristics."); *Reeves*, 631 F.2d at 385, n. 10, quoting *Grayned* ("The controlling factor is … the 'pattern of … normal activities' of a particular locale at a particular time."); *Lionhart*, 100 F.Supp.2d at 387, quoting *Grayned* ("The Court must consider the nature of the place where speech is regulated and the 'pattern of … normal activities' there to determine whether the regulation is reasonable.").

As the Fifth Circuit has noted, "[p]recisely because the downtown district is already a busy and noisy place, reasonably amplified speech is guaranteed a broad right to equal participation in these aspects of modern urban life. ... [T]here is probably no more appropriate place for reasonably amplified speech than the streets and sidewalks of a downtown business district."  *Reeves* at 384.  Thus, noise ordinances applicable to busy, congested areas have been found to be not sufficiently tailored to a legitimate

government interest when the government provides no evidence that the ordinance restricts only noise that is excessive for that particular area. *See, e.g.*, *Doe*, 968 F.2d at 90 (60-decibels-at-50-feet limit on speech in traditional public forum park not proven to be narrowly tailored to interest in preventing "excessive" noise where there is no evidence "indicating how disturbing or 'excessive' a noise (by any standard) 60 decibels at 50 feet is."); *Beckerman v. City of Tupelo, Miss.*, 664 F.2d 502, 516-517 (5th Cir. 1981)(noise ordinance reached more broadly than necessary when it prohibited sound trucks in downtown and shopping districts even in daylight hours "when many people are abroad"); *Reeves*, 631 F.2d at 384-385 (ordinance prohibiting use of sound amplification equipment in downtown business district at any time except Sunday afternoons not narrowly tailored because no evidence that sound amplification not compatible with the normal activity of downtown district); *Rohman*, 909 F.Supp. at 774 (restriction on speech intended to be heard at 10 or more feet distant from the speaker is unreasonably restrictive when applied to city's "premier public gathering spot," and where there is no evidence "indicating the degree of disturbance created by or the excessiveness of a noise traveling ten feet" at that location).

The City's Noise Ordinance at issue in this case is not even as narrow as the ordinances cite above which were found to be unconstitutional. As in the above referenced cases, the City's Noise Ordinance applies to the busy downtown city location. However, the challenged portions of the City's Noise Ordinance[5] do not prohibit noise above a particular decibel level or noise which can be heard from a particular distance.

---

[5] There are some portions of the Noise Ordinance not at issue in this case which are much narrower. For example, Plaintiff does not challenge the second part (i.e., sentence) of §391-302(a)(2), which prohibits the use of musical instruments, among other things, "between the hours of 11:00 p.m. and 7:00 a.m. in such a manner as top be plainly audible at a distance of fifty (50) feet from the building … in which [the musical instrument] is located."

Rather, the Noise Ordinance prohibits any noise which is "loud, unnecessary or unusual" or which "annoys or disturbs" others within the city.  §391-302(a).  It similarly prohibits the use of musical instruments[6] and similar devices in such a way as to "disturb" or "annoy" others.  §391-302(a)(2)(3).  And "[y]elling[7], shouting, hooting, whistling or singing … at any time or place so as to annoy or disturb … any person in the vicinity" is also prohibited.  §391-302(a)(4).  Finally, the Noise Ordinance prohibits the use of drums or other instruments for the purpose of attracting attention to any performance, exhibition, show or sale, even if the noise of the drum annoys no one.  §391-302(a)(13).

None of these sections of the Noise Ordinance have anything to do with the volume of noise created.  Rather, one could speak to another person in a moderate tone on a city sidewalk and, if someone passing by happened to overhear the speech and become "annoyed" or "disturbed" by it, the speaker would be in violation of the City's Noise Ordinance.  Thus, the Noise Ordinance is obviously not narrowly tailored to preventing excessively loud noise, regardless of the location.  And it certainly is not narrowly tailored to prevent noise that could reasonably be considered "excessive" in the context of the busy downtown business district during daytime hours.[8]

---

[6] "Music, as a form of expression and communication, is protected under the First Amendment.  *Ward*, 491 U.S. at 790.  *See also*, *Doe*, 968 F.2d at 88 ("[B]eating a drum in the context of a clearly identified anti-war demonstration is expressive conduct protected by the First Amendment."); *Lionhart*, 100 F.Supp.2d at 386 (both music and the use of sound amplification equipment are protected under the First Amendment).

[7] There is no question that amplified speech is sometimes essential to effective communication and, as such, it is protected under the First Amendment.  *See, e.g., Stokes v. City of Madison*, 930 F.2d. 1163, 1169 (7th Cir. 1991).  Moreover, the mere existence of the alternative of unamplified speech does not, itself, justify the restraint on the particular means of amplified speech that the speaker finds more effective.  *Reeves*, 631 F.2d at 382.

[8] For these same reasons, the Noise Ordinance is not the least restrictive means of achieving the government's goals, as a content-based restriction must be in order to pass constitutional muster.  *Boos,* 485 U.S. at 321.  For example, the City could achieve its goal of preventing excessive noise by prohibiting noise that could be heard a certain number of feet from the source.  This is a much less restrictive alternative to banning all "annoying" or "disturbing" speech, and it would also turn the current content-based restriction into a permissible content-<u>neutral</u> restriction.

B.     The Noise Ordinance is unconstitutionally overbroad.

In the First Amendment context, overbreadth is a particular concern.

> Under the First Amendment overbreadth doctrine, an
> individual whose own speech or conduct may be prohibited
> is permitted to challenge a statute on its face "because it
> also threatens others not before the court -- those who
> desire to engage in legally protected expression but who
> may refrain from doing so rather than risk prosecution or
> undertake to have the law declared partially invalid."
> *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503 . . .
> (1985).  A statute may be invalidated on its face, however,
> only if the overbreadth is "substantial." *Houston v. Hill,*
> 482 U.S. 451, 458-459 . . . (1987). . .

*Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.,* 482

U.S. 569, 574 (1987).  Substantial overbreadth is present if there is "a realistic danger

that the statute itself will significantly compromise recognized First Amendment

protections of parties not before the Court. . ."  *Members of the City Council of Los*

*Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801 (1984).  The doctrine applies to

ordinances as well as statutes.  *See e.g., Forsyth County, Georgia v. Nationalist*

*Movement*, 505 U.S. at 134.

As noted above, it is clear from the face of the City's Noise Ordinance itself that

it will prohibit constitutionally protected activity.  The ordinance prohibits noise that is

"unnecessary" or "annoying" or "disturbing."  However, such speech or expressive

activity is clearly protected.  *See, e.g., Grayned*, 408 U.S. at 114 ("'Undesirables' or their

'annoying' conduct may not be punished."); *Coates*, 402 U.S. at 615 ("The First and

Fourth Amendments do not permit a State to make criminal the exercise of the right of

assembly simply because its exercise may be 'annoying' to some people."); *Cox v. State*

*of Louisiana*, 379 U.S. 536, 551 (1965)("[C]onstitutional rights may not be denied simply

because of hostility to their assertion or exercise."); *Dae Woo Kim*, 774 F.Supp. at 170 (ordinance prohibiting "unnecessary noise offends basic free speech principles because it would support a conviction where the content of the speech annoys a particular listener."); *Fratiello*, 653 F.Supp. at 791, citing *Cohen v. California*, 403 U.S. 15 (1971)("Public discourse may not be prohibited simply because it may be deemed unnecessary and/or annoying to the listener."). The Noise Ordinance's ban reaches speech that is no louder than normal noise on a city street, simply because someone finds the speech "annoying."  This is unconstitutionally overbroad.

The federal courts have had no difficulty in holding that ordinances worded in broad terms similar to those of the Indianapolis ordinance are unconstitutionally overbroad.  *See, e.g.*, *Cox*, 379 U.S. at 551-552 ("breach of peace" statute prohibiting speech that "agitated" others overbroad since it "would allow persons to be punished merely for peacefully expressing unpopular views."); *U.S. Labor Party v. Pomerleau*, 557 F.2d 410, 413 (4th Cir. 1977)(noise ordinance overbroad because it prohibits amplification that creates no more noise than a person speaking slightly louder than normal); *Lionhart*, 100 F.Supp.2d at 388 (anti-noise statute overbroad where it exposed "citizens to criminal prosecution for making sounds well within the normal range for city streets and in city parks); *Dae Woo Kim*, 774 F.Supp. at 170 (ordinance barring noise that is "unnecessary" because it "annoys" or "disturbs" others is unconstitutionally overbroad; it would apply to speech delivered in a moderate tone, or even a whisper, so long as it annoys another person);  *Fratiello*, 653 F.Supp. at 791 (ordinance forbidding all "unnecessary noise or sounds by means of the human voice .. which are physically annoying to persons" is overbroad; "public discourse may not be prohibited simply

because it may be deemed unnecessary and/or annoying to the listener."); *U.S. Labor Party v. Rochford*, 416 F.Supp. 204, 206-207 (N.D.Ill. 1975)(ordinance prohibiting "crying, calling or shouting," among other things, is overbroad because it prohibits protected speech, such as reasonably amplified speech necessary to be heard above normal noises of the city).

Because the City's Noise Ordinance prohibits speech merely because it is deemed "unnecessary," "unusual," "annoying," and/or "disturbing" to others, it is unconstitutionally overbroad.

C.      The Noise Ordinance is unconstitutionally vague.

A law[9] is "void-for-vagueness" if it does not define an offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." K*olender v. Lawson*, 461 U.S. 352, 357-58 (1983). In *Grayned v. City of Rockford*, the Court discussed the values offended by vague laws:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone … than if the boundaries of the forbidden areas were

---

[9]  The void for vagueness doctrine applies equally to municipal ordinances as well. They, too, must fall if they have the vice of being so indefinite that reasonable persons must guess at their meaning and if they invite arbitrary and discriminatory enforcement by law enforcement officials who are left without standards. *See e.g., Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620-22 (1976).

clearly marked.'

408 U.S. at 108-109 (footnotes/citations omitted.)  Thus, "[s]tandards of permissible

statutory vagueness are strict in the area of free expression."  *NAACP v. Button*, 371 U.S.

415, 432 (1963).  "Where a statute's literal scope, unaided by a narrowing state court

interpretation, is capable of reaching expression sheltered by the First Amendment, the

doctrine demands a greater degree of specificity than in other contexts."  *Smith v.*

*Goguen,* 415 U.S. 566, 573 (1974).

     As previously noted, subsections (a)(2)-(4) of the City's Noise Ordinance prohibit

various types of "unnecessary or unusual" noise that "annoys" or "disturbs" others.

These terms are unconstitutionally vague.  The Indiana Court of Appeals has so held

regarding subsection (a) and the first portion of subsection (a)(2) in the case *Lutz v. City*

*of Indianapolis*, 820 N.E.2d 766 (Ind.Ct.App. 2005).[10]  That Court noted that these

subsections of the ordinance[11] do "not include an objective test," instead prohibiting "*any*

noise that is 'loud,' 'unnecessary,' or 'unusual,' or that annoys or disturbs others." *Id*. at

769 (emphasis original).  "Such language does not enable individuals of ordinary

intelligence to adequately comprehend what conduct the Ordianance is prohibiting."  *Id.*

     The reasoning of *Lutz* applies equally to the other subsections challenged in this

case, which also prohibit "annoying" or "disturbing" noise.   The U.S. Supreme Court has

held that an ordinance prohibiting assembly and conduct on public sidewalks in a manner

"annoying" to persons passing by was unconstitutionally vague:

          Conduct that annoys some people does not annoy others.  Thus, the

---

[10] Although these subsections of the ordinance should no longer be in effect, given the *Lutz* holding, they are still "on the books."  (See Parties Stipulation to Facts, ¶4, and attachment.)  Therefore, this memorandum addresses these subsections, as well as subsections (a)(3) and (4), which also prohibit "annoying" and/or "disturbing" noise.

[11] Subsections (a)(3)(4) and (13) were not at issue in *Lutz*, and were not addressed by that Court.

ordinance is

> vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.  As a result, 'men of common intelligence must necessarily guess at its meaning.'

*Coates*, 402 U.S. at 614 (citations omitted).

Many other federal courts have also struck down laws prohibiting "annoying" noise and/or conduct.  *Jim Crockett Promotion v. City of Charlotte*, 706 F.2d 486 (4th '83)(portion of ordinance prohibiting "unnecessary" noise is unconstitutionally vague); *Pomerleau*, 557 F.2d at  (noise ordinance vague where its violation depends on the location from which a police officer subjectively decides to measure the decibels); *McCray*, 2000 WL 1174728, *5-6 (zoning ordinance applying to "amplified" music is unconstitutionally vague, and made no more clear by defining it in terms of whether it "annoys"); *Lionhart*, 100 F.Supp.2d at 389 (ordinance prohibiting use of sound producing device in manner "likely to annoy" is unconstitutionally vague);  *Dupres*, 978 F.Supp. at 433 (ordinance prohibiting "disturbing or unnecessary noise" that "annoys" or "disturbs" is vague because violation depends on subjective opinions of complaining citizens, and the ordinance does not specify the context in which it applies); *Rohman*, p. 774 (ordinance defining offensive conduct as intending to communicate with another person over ten feet away is vague because a speaker of ordinary intelligence could not understand what conduct is prohibited and it is susceptible to discretionary enforcement); *Dae Woo Kim*, 774 F.Supp. at 170 (statute prohibiting "unnecessary noise" that "annoys" others is vague); *Langford v. City of Omaha*, 755 F.Supp. 1460 (D.Neb. 1989)(ordinance prohibiting "unreasonable" noise and "annoying" conduct is unconstitutionally vague); *Fratiello*, 653 F.Supp. at 790 (ordinance "prohibiting 'unnecessary noises or sounds …

which are physically annoying' fails to provide the requisite clear notice of what is prohibited"); *Rochford*, p. 207 (noise ordinance was vague because it used a subjective standard that depended on police officer's hearing acuteness, temperament and frame of mind, or even his opinion of merits of the speech); *Phillips v. Borough of Folcroft, Penn.*, 305 F.Supp. 766, 770-71 (E.D.Pa. 1969)(even the term "loud" noise is vague, but "unnecessary" noise is "death knell" for disorderly conduct ordinance; violation depends on whether listener thinks the sound is unimportant or nonessential, and the ordinance allows for unlimited discretion in enforcement).

The City's Noise Ordinance prohibiting "loud, unnecessary, or unusual noise" and various noises that "annoy" or "disturb" others suffers from similar vagueness problems. It fails to provide fair warning to a person of ordinary intelligence regarding what is prohibited, it lacks any objective standard to guide law enforcement, making arbitrary and discriminatory enforcement likely, and it's uncertain meaning will inevitably chill protected speech.   The ordinance is unconstitutional.

**II.     Plaintiff is being caused irreparable harm for which there is no adequate remedy at law.**

The violation of the First Amendment, for even "minimal periods of time" is "unquestionably . . . "irreparable injury."  *Elrod v. Burns,* 427 U.S. 347, 373 (1976)(plurality).  Local 3 has no possible remedy at law to rectify this injury since it wishes to get its message out by protesting on the public sidewalks of Indianapolis but has no way of knowing what noise is prohibited by the ordinance during such protests. Without a preliminary injunction it will therefore suffer irreparable harm for which there is no adequate remedy at law.

19

**III.    The balance of harms favors the plaintiff.**

If a preliminary injunction is granted Indianapolis simply will be required to allow Local 3 and its supporters to exercise their First Amendment rights.  Against this is the First Amendment violation to which Local 3 is subject.  The balance of harms favors the plaintiff.

**IV.    The public interest would be served by the grant of a preliminary injunction**

"The public has an interest in the protection and preservation of First Amendment rights.  'Vindication of constitutional freedoms and protection of First Amendment rights is in the *public interest.'  Albright v. Board of Education of Granite School District,* 765 F.Supp. 682, 686-87 (D.Utah 1991)."  *McIntire v. Bethel School,* 804 F.Supp. 1415, 1429 (W.D.Okl. 1992).

**V.    The injunction should issue without bond.**

If the injunction is granted Indianapolis will be exposed to absolutely no monetary liability.  In the absence of such injury, no bond should be required.  *See e.g., Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 983 (2nd Cir. 1996).

**Conclusion**

For the above reasons a preliminary injunction should be granted here and the challenged subsections of the Noise Ordinance should be enjoined.

  s/Jacquelyn Bowie Suess/
Jacquelyn Bowie Suess
Indiana Civil Liberties Union
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059 ext. 225
Fax: 317/635-4105
Email:jacquelyn.bowie-suess@iclu.org

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on the 8th day of December, 2005.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Andrew J. Mallon
Assistant Corporation Counsel
200 E. Washington St., Ste. 1601
Indianapolis, IN  46204


 s/Jacquelyn Bowie Suess/
Jacquelyn Bowie Suess